IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Kyle Conley, | : | |
| | : | Case No. 1:16-cv-1105 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting in Part and Denying in |
| Lakota Local School District, *et al.*, | : | Part Motions for Summary Judgment |
| | : | |
| Defendants. | : | |

This matter is before the Court on the Motions for Summary Judgment (Docs. 43, 45)

filed by Defendant Lakota Local School District ("Lakota") and Defendant Fairfield City School

District ("Fairfield"), respectively, as well as a Motion in Limine to Exclude Testimony of

Virginia L. Rhodes (Doc. 54) and the Objections and Motion to Strike Inadmissible Evidence

(Doc. 55) both filed by Lakota. Plaintiff Kyle Conley, a licensed school teacher who is blind, is

suing Lakota and Fairfield after the school districts blocked him from applying for substitute

teaching positions within their districts. He asserts claims for disability discrimination and

failure to accommodate.

Lakota and Fairfield both seek summary judgment. Fairfield asserts that Conley has

refused to accept the reasonable accommodation of having a sighted aide present in the

classroom with him, and alternatively, that he is not qualified to perform the essential functions

of a substitute teacher with or without reasonable accommodation. Lakota makes the latter

argument only. Lakota also moves to strike or exclude purportedly inadmissible evidence

submitted by Conley in opposition to summary judgment. For the reasons that follow, the Court

will **DENY** the Motion in Limine to Exclude and the Objections and Motion to Strike, and the Court will **GRANT IN PART AND DENY IN PART** the Motions for Summary Judgment.

## I.     BACKGROUND

### A.     Factual Background

The following facts are derived from Lakota's Statement of Undisputed Facts (Doc. 43-1), Fairfield's Proposed Undisputed Facts (Doc. 44), and Plaintiff's Responses thereto (Docs. 49-1, 50-1), except as otherwise noted.

#### 1.     Conley's Education and Qualifications as a Substitute Teacher

Kyle Conley has been totally blind since birth. He can perceive light versus darkness, but he cannot see images at all.[1] Conley attended Fairfield High School and graduated in 2008. He then attended Wright State University to pursue an education degree. He did a semester student teaching at the Mad River Local School District while attending Wright State. (Conley Dep., Doc. 35-1 at PageID 124, 147.) As a student teacher, Conley was generally required to be supervised by the regular teachers in the classroom, but the regular teachers would leave the classroom for ten or fifteen minutes at a time to give Conley experience managing a classroom. (*Id.* at PageID 147.) Conley does not know where or how far away the regular teachers went when they left the classroom. (*Id.*)

Conley graduated from Wright State in 2014 with a bachelor's degree in music with a primary emphasis on violin and a secondary emphasis on voice and piano. He now holds teaching licenses for music in the State of Ohio for grades K–12 and in the State of West Virginia for pre-kindergarten through age 21. He also held a one-year Ohio substitute teacher

---

[1] Lakota points out that Conley testified, in response to a direct question at his deposition, that he does not consider himself to be disabled. (Doc. 35-1 at PageID 145.) There was no follow up to this isolated question and answer. The Court does not interpret this testimony to waive his legal rights as a disabled person.

license that enabled him to substitute teach in subjects other than music for the 2014–2015 school year. (*Id.* at PageID 125.) After graduating from Wright State, he began working as a substitute teacher and searched for a full-time teaching position. He was not hired for a full-time position for the 2014–2015 school year.

Substitute teachers for school districts in Butler County, Ohio are employed by the Southwest Ohio Counsel of Governments ("SWOCOG"). SWOCOG utilizes a computer program called AESOP to place substitute teachers at school districts in Butler County. AESOP notifies substitute teachers when there is an opening that meets the position parameters the substitute teacher has entered into AESOP. AESOP provides the potential substitute teachers with the day and time they are needed, the name of the teacher for whom they are substituting, and the subject matter they will be teaching. Substitute teaching positions are filled on a first-come, first-served basis.

Conley first applied to be a substitute teacher through SWOCOG on June 10, 2014. He was hired as an at-will employee of SWOCOG with no employment contract. He was paid by SWOCOG and received his W-2 form from SWOCOG at the end of the year. Conley did not seek substitute teaching positions from any school district or entity other than those affiliated with SWOCOG. Conley requires twenty-four hours of advanced notice in order to accept a posted substitute position on SWOCOG. For example, he could not accept a substitute position that was posted on the date that the substitute teacher was needed. (*Id.* at PageID 151.)

When Conley arrives to substitute at a school building, he walks around to learn the layout of the building, including the location of the exits and the restrooms, sometimes with the assistance of a secretary. Conley understands that maintaining student discipline in the classroom and ensuring student safety are essential functions of being a teacher. He concedes

that he cannot handle some disciplinary situations or student misbehavior as well as a person with full eyesight. For example, he testified that he would be able to hear if a student was destroying property, scribbling on their desk, or struck another student. (*Id.* at PageID 167.) However, he admitted that he would have only a general idea of the identity of the student who misbehaved based on the direction the noise came from. (*Id.*) He also admitted that he would not know if a student violated the dress code, had a weapon, used nonverbal profanity, engaged in certain forms of cheating, or engaged in inappropriate sexual behavior in the classroom unless another person told him. (*Id.* at PageID 168–69.) Conley testified that when a student requests to go to the nurse for a minor cut or injury, he has to ask another student to verify if the student requires medical attention. (*Id.* at PageID 145.)

When questioned about student safety, Conley testified that he received informal training in West Virginia on handling a school lockdown situation and that he has participated in school fire drills when substitute teaching. (*Id.* at PageID 136, 140.) He testified that he has not had to handle an actual emergency situation. (*Id.* at PageID 140.) Conley does not know or learn the location of the fire extinguishers, fire alarms, or defibrillators in the building when he arrives to substitute teach at a new building. (*Id.* at PageID 155.)

Conley testified generally that he does not need the assistance of a sighted aide in the classroom and that it would interfere with his ability to be a teacher:

> I feel that if I had someone in the classroom I would feel that I would not have full teaching control of the classroom. I would not be managing all aspects of the classroom, like I know I am capable of doing and have had success doing.

(*Id.* at PageID 172–73.) However, he admitted that when he has had teachers or administrators present in the classroom when he was teaching it did not interfere with his ability to teach music. (*Id.* at PageID 173.)

4

## 2. Conley's Substitute Teaching Experience at Fairfield

Conley signed up through the AESOP program to teach at the Fairfield middle school on September 8 and 9, 2014 and at the high school on September 10, 2014. (*Id.* at PageID 128.) Julie Klint, the high school teacher for whom he would be substituting, was concerned about whether Conley would be able to administer a test for her and maintain test security while managing the classroom. She also was worried about how he would handle the fire drill scheduled for the day of her absence. She presented her concerns to the high school principal, who passed along her concerns to Roger Martin, as assistant superintendent. Martin contacted Tom Isaacs, the superintendent for SWOCOG. He told Isaacs that Fairfield was worried about Conley's ability to provide classroom management and about the safety of students. (Martin Dep., Doc. 42-1 at PageID 501–02.) Isaacs told Martin that Conley was an at-will employee and that Fairfield could choose whether to employ him or not. Martin told Isaacs that Fairfield would use Conley as a substitute if he was provided the accommodation of a sighted aide in the classroom. Isaacs did not think that it was reasonable to expect SWOCOG to provide a sighted aide to Conley as an accommodation. (*Id.* at PageID 502.) Fairfield ultimately requested that Conley be blocked in the AESOP system from substitute teaching at Fairfield.

Conley asked to meet with Martin, whom he knew when he was a second-grade student and Martin was the assistant principal at a Fairfield elementary school. In response to Martin's question, Conley explained to Martin that he was totally blind. Martin and Conley discussed how Conley manages classroom behavior, cheating, and fire drills. Conley told Martin that he requests to receive lesson plans in advance so that he can convert them to Braille. He also told Martin that he sometimes requested help from "good students in the class" and from teachers in neighboring classrooms. Martin determined after the meeting that he still would request that

Conley be blocked from substitute teaching at Fairfield. He determined that having Conley teach without a sighted aide would put student safety at risk and adversely affect the quality of instruction.

### 3. Conley's Substitute Teaching Experience at Lakota

Conley substituted for three half-days at Lakota schools on September 11, 12, and 17, 2014. He requested to receive the lesson plans for the classes twelve hours in advance as an accommodation. He taught sixth grade math at Hopewell Elementary on September 11, 2014 in the afternoon. He met with Amy Alexander, the teacher for whom he was substituting that morning, but he testified that did not meet with the principal. (Conley Dep., Doc. 35-1 at PageID 156–57.) A secretary showed him to the classroom, and later he walked with another teacher to take the students to the cafeteria and then to go the teacher's lounge. (*Id.* at PageID 156.) Conley testified that an intervention specialist assigned to help a student or students with individualized education plan(s) ("IEPs") was in the classroom the entire time. Conley understood that the specialist was there because it was required by the IEPs, not because he was teaching the class. (*Id.* at PageID 157.)

Conley's testimony is contradicted in part by the testimony of Christina French, the Hopewell principal. She testified that she introduced herself to Conley that afternoon. (Doc. 36-1 at PageID 251.) More importantly, she testified that she made arrangements to have a special education teacher, Nancy Wilson, be present in the classroom with Conley because Alexander was concerned about student safety due to Conley's blindness. Wilson co-taught the class with Alexander, and she had the ability to pull out the students with IEPs as needed. Wilson had intended to pull out students to take a quiz, but they decided that she would stay in the classroom with Conley because they were concerned that the students could misbehave or even leave the

classroom and Conley would not know.  (*Id.* at PageID 251–54.)[2]  The teachers' concern was heightened because there were students with IEPs in the classroom and the classroom was close to the front doors of the school.  (*Id.* at PageID 254.)  French herself stayed in the classroom with Conley for fifteen minutes that afternoon when Wilson had to step away.  French did not observe any troubling situations when she was in the classroom.  (*Id.* at PageID 256.)  French determined that she would need to make plans to have another adult in the classroom if Conley ever substitute taught at Hopewell again, but he did not.  (*Id.* at PageID 255.)

On September 12, 2014, Conley taught three music classes in the morning at Heritage Elementary.  He received the lesson plan and communicated with the regular teacher in advance by email.  (Conley Dep., Doc. 35-1 at PageID 157.)  He did not meet with anyone to discuss student safety or discipline.  He testified that no other adults were present in the classroom when he taught, but he does not know if anyone stopped by the classroom to check student safety and security.  (*Id.* at PageID 158.)

On September 17, 2014, Conley taught afternoon music classes at Cherokee Elementary.  He met with the principal, Paulette Grady, in the classroom before the students arrived.  Grady told Conley that she was placing an aide in the classroom because some students had allergy issues and Conley would not know if they had a reaction.  Conley testified that he was "shocked" by her decision, but he did not object because there was not time to discuss the issue before the students arrived.  (*Id.*)  Grady testified that she wanted an aide with Conley because she was particularly concerned about safety given Conley's blindness and the fact that the music classes were taught in a separate, portable building.  (Doc. 39-1 at PageID 438–39.)  She also testified

[2]  French's testimony about what Alexander and Wilson told her is hearsay if offered for the truth of the matter asserted, but it can be considered as to why French arranged to have a second teacher in the classroom with Conley on September 11.

7

that she was worried about students in the class with serious allergy problems. (*Id.* at PageID 440–41.) Grady reported her concerns and her plan to have an aide in the classroom with Conley to the Lakota human resources director, Diane Brunsman. (*Id.* at PageID 439.) Grady admitted that she would have wanted an aide or another teacher in the classroom with Conley even if he had been teaching the music class in the main building. (*Id.* at PageID 442.) Conley did not talk to the aide that afternoon. He agreed the aide did not interfere with his teaching music. (Conley Dep., Doc. 35-1 at PageID 159.)

After Conley taught on September 17, 2014, Brunsman contacted SWOCOG and requested that it remove Conley through the AESOP computer program from the eligibility list for teaching at Lakota schools. Conley emailed Brunsman to ask why he had been blocked from substitute teaching at Lakota schools, but she did not respond. Instead, she forwarded the email to Lakota's legal counsel. (Brunsman Dep., Doc. 38-1 at PageID 353.) Brunsman denied that she blocked Conley because of his disability. (*Id.* at PageID 354.) She testified that she blocked him for the following reasons:

> I blocked him because of his inability to perform the essential functions of a substitute teacher, in my opinion. * * * I believe he can't be a credible person to pro—perform care, custody, and control of students, which would be the safety factor. If you can't see the children, I don't believe you can be in charge of the classroom efficiently, for safety.

(Doc. 38-1 at PageID 354.) She agreed he could not be in charge of a classroom efficiently because "he can't see." (*Id.*) She further testified that as a general statement she never would be comfortable having a totally blind teacher in the classroom without a sighted aide. (*Id.* at 357.) She had approved hiring a legally blind Latin teacher who was able to see shapes to a permanent teaching position. (*Id.* at 355.) She believed the Latin teacher was distinguishable from Conley because the Latin teacher could see shapes, whereas Conley could not, and because he had more

familiarity with the environment, structures, and building culture of the school as a permanent teacher.  (*Id.*)

### 4. Conley's Teaching Experience at Other School Districts

After he was blocked from Hamilton and Lakota, in December 2014, Conley added Ross Local School District ("Ross") to the list of SWOCOG school districts in which he would substitute.  He substituted there an unspecified number of times without incident until February 2014.  At the end of the one day at Ross, one boy fell to the ground after "shuffling" with another boy who pulled on his backpack.  (Doc. 35-1 at PageID 131.)  Conley did not receive any other teaching assignments at Ross after that incident; Ross had removed him from the substitute teacher eligibility list through AESOP.  (*Id.*)  He has resolved his dispute at Ross and is eligible to substitute teach there again.  (*Id.* at PageID 131–32.)

Conley also worked as a substitute teacher during the 2014–2015 and the 2015–2016 school years for the Hamilton City School District ("Hamilton") and the Edgewood Local School District ("Edgewood").  He taught most often in Hamilton.  (Doc. 35-2 at PageID 176.)  However, he later decided to no longer substitute teach at Hamilton because the schools have more student discipline issues and he was concerned for his safety.  (Conley Dep., Doc. 35-1 at PageID 152–53.)

During the 2016–2017 school year, Conley was employed by Williamson High School in Wood County, West Virginia teaching music for grades five through twelve as a long-term substitute teacher.  (*Id.* at PageID 132.)  The high school wanted to hire Conley as a full-time teacher for the next school year, but the district was forced to make teacher cuts across the district.  (*Id.*)  The principal's evaluation of Conley at the end of the school year included the following comments:

Kyle does an excellent job in the classroom.  Students work hard and perform
well for him.

Kyle does an excellent job implementing his lesson plans.

Kyle follows all policies and procedures.  He monitors and keeps track of students
and grades.

Kyle makes sure that effective communication is maintained with staff, students
and administration.  He communicates well with parents.

Kyle is professional in his dress and interaction with students and staff.  Performs
assigned duties.

Kyle is visually impaired yet students have excepted [*sic*] his handicap and have
always been there to assist him in any matter.  We wish Kyle the best in his future
endeavors.

(Doc. 35-4 at PageID 180–83.)[3]

During the 2017–2018 school year, Conley returned to Ohio.  He substitute taught for the

Edgewood, Monroe, and Ross school districts up to three days per week.  He also had a part-

time, permanent position teaching music two days to kindergarten through eighth grade students

at St. Louis School in Owensville, Ohio.

**5.      Expert Opinion Testimony**

Conley offers the expert opinion testimony of Virginia Rhodes, Ed.D, an educator with

twelve years of experience teaching, fifteen years of experience in school administration, and

eight years of experience on a public school board.  (Doc. 48-4 at PageID 1223.)  Rhodes offered

the following three opinions in her expert report:

1.  Kyle Conley is qualified, with minimal accommodations, to perform the
essential functions of the job of a substitute or teacher in grades 5-12.  The
disability of blindness, including total blindness, does not by itself disqualify an
otherwise qualified candidate or employee from teaching, as reasonable

_____

[3] Lakota moves to strike this evaluation as "an unauthenticated hearsay document."  (Doc. 55 at PageID 1353.)

accommodations can be identified to enable a sub or teacher to perform the essential functions of the job.

2. The defendants failed to use professionally sound, rational and reasonable means or their own professional skills to assess Mr. Conley's qualifications, performance and fitness for duty in substitute teaching. Instead, district leadership personnel magnified the fears and uninformed reactions of various staff members who expressed concern about his disability. District leadership also failed to use their professional skills to test or challenge those assumptions and fears, denying Mr. Conley future work opportunities without adequate research or investigation into those concerns. With their actions, the defendants also violated their own district policies and goals on diversity, equity, fair employment and cultural competence.

3. A professionally sound, rational and reasonable assessment of Mr. Conley's qualifications for a substitute teaching position, along with decision-making consistent with ADA and district policy, would have resulted in the decision of both districts to continue working with him as a substitute teacher.

(*Id.* at PageID 1213.)

## B.    Procedural Posture

Conley initiated this suit against Lakota, Fairfield, Ross, and SWOCOG on November 23, 2016. He asserted claims for failure to accommodate and for disability discrimination, both in violation of the Americans with Disabilities Act ("ADA") and Ohio Revised Code § 4112.02 against all four Defendants. (Doc. 1.) The Court entered Agreed Orders of Dismissal as to Ross and SWOCOG on September 11, 2017. (Docs. 29, 30.) However, the claims against Lakota and Fairfield proceeded through discovery.

Lakota and Fairfield now have moved for summary judgment. Conley filed briefs in opposition, and he submitted an expert report by Virginia Rhodes in support of that opposition. Lakota then moved in limine to exclude the report and testimony of Rhodes and to strike other evidence submitted by Conley. The motions are fully briefed and ripe for adjudication.

11

## II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted).

Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

During summary judgment briefing, a movant asserting that a fact cannot be genuinely disputed can support that assertion by showing "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). Either party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In the advisory committee notes to the 2010 amendments, the committee states that "[t]he burden is on the proponent to show that the material is admissible as presented *or to explain the admissible form that is anticipated*." Fed. R. Civ. P. 56 (2010 Amendments advisory committee notes). Finally, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

### A.    Motion in Limine to Exclude Testimony and Objections and Motion to Strike Inadmissible Evidence

Lakota has moved in limine to exclude the testimony of Conley's purported expert opinion witness, Virginia L. Rhodes, and to strike evidentiary materials it considers to be inadmissible, including portions of Rhodes's expert report. The Court will address Rhodes's report and testimony first and then address the remaining miscellaneous evidentiary arguments.

The Federal Rules of Evidence allow an expert to offer opinion testimony as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

13

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

A district court performing a Rule 702 analysis must act as a gatekeeper to ensure that the expert is qualified and that testimony is both relevant and reliable. *See U.S. v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016); *U.S. v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (citation omitted). The district court must perform its gatekeeper function before the testimony can be admitted regardless of whether the testimony is based on scientific knowledge, technical knowledge, or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 147–49 (1999); *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006).

"[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted). As such, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998) (citation omitted). The trial court's role as a gatekeeper of expert testimony is not meant to serve as a replacement of the adversary system. *See Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014) (citation omitted). An evaluation of the reliability of an expert opinion does not involve a determination of whether the opinion is correct. *In re Scrap Metal*, 527 F.3d at 529–30; *GED Integrated Solutions, Inc. v. Durotech Int'l, Inc.*, No. 5:06CV1327, 2009 WL 233872, at *4 (N.D. Ohio Jan. 30, 2009) (citing *In re Scrap Metal*). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993).

In certain cases, an expert's experience alone may provide a reliable basis for his

testimony. Fed. R. Evid. 702 (2000 Amendments advisory committee notes); *see also Campbell*

*v. City of Springboro, Ohio*, 788 F. Supp. 2d 637, 662 (S.D. Ohio 2011) (stating that reliability

concerns may focus on personal knowledge and experience). "If the witness is relying solely or

primarily on experience, then the witness must explain how that experience leads to the

conclusion reached, why that experience is a sufficient basis for the opinion, and how that

experience is reliably applied to the facts." Fed. R. Evid. 702 (2000 Amendments advisory

committee notes); *see also Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296

(6th Cir. 2007) (quoting the advisory committee notes).

Rhodes has a bachelor's degree in political science from Antioch College, a master's

degree in teaching from Indiana University, and a doctorate in urban educational leadership from

the University of Cincinnati. (Doc. 48-4 at PageID 1225.) She also has received training in the

supervision of students with disabilities, diversity, the supervision of teachers, and school safety.

(*Id.* at PageID 1223.) Rhodes has thirty-five years of experience in public schools in Kentucky

and Ohio, serving as a teacher, assistant principal, and principal at multiple public schools. (*Id.*

at PageID 1225–27.) She served on the Cincinnati Public Schools Board of Education for eight

years. (*Id.* at PageID 1226.) The Court has no trouble concluding that Rhodes could qualify as

an expert witness on a variety of education-related topics. Her report and testimony are reliable

insofar as she explicitly ties her opinions to her experience and training. (*See, e.g.*, *Id.* at PageID

1214 (stating that all administrators know that some sighted teachers do not take necessary steps

to ensure classroom discipline), 1219 (stating that an administrator's observations of a teacher in

the classroom have in her experience been contractually required to last at least twenty minutes);

Doc. 48 at PageID 967–970 (explaining her testimony about what information is provided to a

substitute teacher is based on what was provided to substitutes in the schools in which she

worked).)

Despite Rhodes's years of experience and training, Lakota seeks to exclude the testimony

and report of Rhodes primarily on the basis that she has no experience hiring, working with,

observing, or supervising blind teachers. (Doc. 48 at PageID 977–78.) Lakota, therefore, attacks

the scope of Rhodes's experience. The Sixth Circuit has instructed, however, that "[t]he scope"

of a purported expert witness's expertise "may cut against the weight given to [her] opinion, but

it does not affect its admissibility." *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 453–55

(6th Cir. 2013) (allowing a mechanical engineer who was not a firearms expert to testify

regarding mechanical issues in firearms). Lakota is free to argue that Rhodes's lack of direct

experience with the challenges presented by a blind teacher should affect the weight or

credibility of Rhodes's testimony, but it does not render her testimony inadmissible. *See First*

*Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 331–32 (6th Cir. 2001) (stating that a banker's

lack of familiarity with lender-borrower relationships might affect the weight and credibility of

his testimony, but not the admissibility of his testimony given his forty years of experience in the

industry).

Lakota also challenges the relevancy of Rhodes's testimony arguing that the subject

matter on which she opines is not "beyond the ken of the average juror." *U.S. v. Rios*, 830 F.3d

403, 413 (6th Cir. 2016), *cert. denied sub nom. Casillas v. U.S.*, 137 S. Ct. 1120 (2017), and *cert.*

*denied,* 138 S. Ct. 2701 (2018). Lakota argues generally that Rhodes cannot have specialized

knowledge beyond the ken of an average juror because she herself has no experience with a blind

teacher. As stated above, this argument goes to the weight of Rhodes's testimony, not its admissibility. Also, "[t]o determine whether an expert's testimony will be relevant, we look to 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'" *Id.* (quoting Fed. R. Evid. 702 (advisory committee notes)). Rhodes gives opinions on teacher qualifications and classroom management beyond the knowledge of an average juror. For example, she explains specific techniques teachers use to deter classroom misbehavior, requirements for student safety plans, and standards assessing teacher performance. (Doc. 48-4 at PageID 1214, 1216, 1218–19).

Finally, Lakota argues that portions of Rhodes's testimony should be excluded for improperly expressing a legal conclusion or misstating legal principles. The Court is not relying on Rhodes's testimony to determine the correct legal standards necessary to resolve the pending Motions for Summary Judgment. Moreover, it is often the "better practice" to address the admissibility of evidence in context at trial. *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir. 1975). For these reasons, the Court will not at this time exclude in limine the expert report or deposition testimony of Rhodes for failing to satisfy the Federal Rules of Evidence.

In addition to these arguments that Rhodes's expert report and testimony should be excluded in total, Lakota also moves to strike portions of Rhodes's report (Doc. 48-4) and the supporting documents for various reasons. Lakota argues that Rhodes's case file (Docs. 48-1, 48-2) and her handwritten notes (Doc. 48-7) should be stricken to the extent they are not specifically cited by Conley in his briefs opposing the Motions for Summary Judgment. This argument turns Federal Rule of Civil Procedure 56(c)(3) on its head. Rule 56(c)(3) provides that

a "[t]he court need consider only the cited materials," but it does not require the Court to strike non-cited materials. Fed. R. Civ. P. 56(c)(3). Rather, the Court has the authority to "consider other materials in the record." *Id.* Moreover, Rhodes's case file and her handwritten notes were introduced as Exhibit 1 and Exhibit 6 at her deposition. (Doc. 48 at PageID 888–90, 895–96; Doc. 48-1; Doc. 48-7.) It is this Court's practice to request that parties electronically file evidence such as expert reports and depositions with exhibits in toto so that the Court can understand the cited portions in context. The Court will not strike Rhodes's case file or handwritten notes on this basis.

Next, Lakota moves to strike any reference to news and/or YouTube reports involving a blind teacher from Indiana named Kathy Nimmer. The Court did not review or rely upon any evidence regarding Kathy Nimmer to decide the pending Motions for Summary Judgment. Therefore, the Court need not strike evidence concerning Kathy Nimmer at this time.

Finally, Lakota moves to strike the West Virginia high school principal's evaluation of Conley as not authenticated and containing hearsay evidence. Conley identified the principal's evaluation as Exhibit 3 during his deposition. (Doc. 35-1 at PageID 132; Doc. 35-4 at PageID 180–83.) It can be admitted at trial for the truth of the matter asserted if it is authenticated as a business record kept in the course of a regularly conducted activity. Fed. R. Evid. 803(6). Evidence is excluded from consideration at summary judgment stage only if it could not be presented in a form that is admissible at trial. Fed. R. Civ. P. 56(c)(2). At summary judgment, the proponent of the evidence need only explain "the admissible form that is anticipated." Fed. R. Civ. P. 56 (2010 Amendments advisory committee notes); *see also Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997) ("The proffered evidence need not be in admissible form, but its content must be admissible.") Conley intends to obtain a certification of the

evaluation as a business record from a Williamstown High School official as permitted by Rule 803(6)(D).  That is sufficient at this stage for the Court to consider the principal's evaluation on summary judgment.

For the foregoing reasons, the Court will **DENY** the Motion in Limine to Exclude Testimony of Virginia L. Rhodes (Doc. 54) and the Objections and Motion to Strike Inadmissible Evidence (Doc. 55).

**B.      Motions for Summary Judgment**

**1.      Disability Discrimination Claims**

The ADA, as amended in the ADAAA, provides that a covered entity "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination is defined to include "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant."  42 U.S.C. § 12112(b)(5)(B).  Likewise, Ohio's anti-discrimination statute, set forth in Ohio Revised Code Chapter 4112, prohibits employment discrimination on the basis of disability.  Ohio Rev. Code § 4112.02(A).  Because the federal and state statutes contain similar prohibitions, courts rely on interpretations of the ADA as persuasive authority in interpreting Ohio's disability discrimination law.  *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010); *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 697 N.E.2d 204, 206–07 (1998).  Ultimately, the plaintiff has the burden to show that the

disability is the but-for cause for the adverse employment decision. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012).

This is a direct evidence case. There is no dispute that Fairfield and Lakota refused to accept Conley as a substitute teacher because he is blind, or because he would not accept the proposed reasonable accommodation of having a sighted aide in the classroom. The Sixth Circuit has set forth the following standard in a direct evidence case:

> (1) The plaintiff bears the burden of establishing that he or she is disabled.
> (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.
> (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (citation omitted). "To show that [he] is otherwise qualified for a position—and thus meet [his] *prima facie* burden—an employee must show that [he] can perform the essential functions of a job with or without an accommodation." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018). Essential functions of a job are "core job duties" the removal of which "would fundamentally alter the position." *Id.* (citing 29 C.F.R. § 1630.2(n)(1) and *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018)).

The primary disputed issue in this case is whether Conley is otherwise qualified for a substitute teaching position—whether he can perform the essential functions of a substitute teacher—or whether he requires the accommodation of having a sighted aide in the classroom. Conley asserts that he can perform the essential functions of a substitute teacher with only minimal accommodations, such as receiving lesson plans in advance and being assisted to the classroom on the first day. Lakota and Fairfield assert different positions on this disputed issue.

20

Lakota argues that Conley cannot perform the essential functions of a substitute teacher with or without a reasonable accommodation. It further argues that even if Conley had suggested using a sighted aide in the classroom as a proposed accommodation, that proposed accommodation would not be reasonable. *See Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 986 (6th Cir. 2011) (concluding that a school district cannot be required to provide a disabled teacher with a full-time aide as a reasonable accommodation).[4] Conversely, Fairfield argues that Conley cannot perform the essential functions of a substitute teacher unless he agreed to the reasonable accommodation of having a sighted aide in the classroom.[5] Conley refuses to accept a sighted aide as a reasonable accommodation.

The parties agree that the essential functions of a substitute teacher include keeping class order and controlling behavior, ensuring student safety, and protecting school property. Fairfield and Lakota put significant weight on Conley's deposition testimony that he would not know if certain types of misbehavior in the classroom occurred—for example, if a student had a weapon, violated the dress code, used nonverbal profanity, or engaged in cheating—unless another student told him. Fairfield points out that Conley stopped substitute teaching in the Hamilton

---

[4] The Sixth Circuit gave two reasons for its conclusion:

> "[T]he ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins* [*v. Oakland Cnty. Sheriff's Dept.*, 227 F.3d 719, 729 (6th Cir. 2000)]; *see also* 29 C.F.R. pt. 1630, app. § 1630.2(*o*) ("An employer or other covered entity is not required to reallocate essential functions."). Furthermore, . . . having another person "instantly available to step in and enforce order at all times" would require the employment of two full-time positions to do the job of a single employee—this is clearly an undue burden on the District and is not a reasonable accommodation.

*Johnson*, 443 F. App'x at 986.

[5] The applicable federal regulation provides that an individual is not required to accept a proposed accommodation. 29 C.F. R. § 1630.9(d). But if an individual *rejects* a "reasonable" accommodation "that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered qualified." *Id.*

schools, which he described as having student discipline problems, because he feared for his personal safety. Lakota also points out that Conley testified that has never been asked to handle an emergency student safety situation so he cannot know that he could handle such a situation.

However, Conley offers evidence that he can perform the essential functions of a substitute teacher for grades five through twelve without a sighted aide in the classroom. Primarily, Conley has served as a substitute and permanent teacher in multiple school districts between 2014 and 2018. He served as a substitute teacher on multiple occasions for the Hamilton, Edgewood, Monroe, and Ross school districts in Ohio. He also served as a long-term substitute music teacher in West Virginia, earning a positive evaluation from the school principal. Finally, he served as a part-time, permanent music teacher in a Catholic elementary school in Ohio. Conley also offers the expert opinion testimony of Rhodes that he can perform the essential functions. She explained how preparation and the use of particular teaching practices, such as varying activities in the classroom, help a teacher maintain classroom order. (Doc. 48-4 at PageID 1214.) She also opined as to safety issues that school safety plans should include contingencies for special needs populations. She stated that Conley can read and understand school safety plans, including evacuation maps, if they are provided to him in advance so he can convert them using a Braille reader. (Doc. 48-4 at PageID 1215–17.)

The Court concludes that Conley has put forward sufficient evidence supporting his argument that he can perform the essential functions of a substitute teacher in grades five through twelve without a sighted aide to warrant a jury trial on the disability discrimination claim. The Court, accordingly, will **DENY** summary judgment to Conley on the disability discrimination claims.

**B.**     **Failure to Accommodate Claims**

An employer discriminates in violation of the ADA when it fails to make "reasonable accommodations to the known physical or mental limitations" of a disabled employee unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business" of the employer.  42 U.S.C. § 12112(b)(5)(A).  The ADA regulations provide that "it may be necessary for the covered entity to initiate an informal, interactive process" with the disabled individual to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3).  The Sixth Circuit has held that employers "must engage in a good faith process and an individualized inquiry to determine whether a reasonable accommodation can be made."  *Hostettler*, 895 F.3d at 857 (internal quotation and citation omitted).

Conley alleges in his Complaint that "Defendants failed to permit Mr. Conley to work with the minimal accommodations he needed, but instead refused to permit him to work without engaging in the interactive process to find reasonable accommodations."  (Doc. 1 at PageID 6–7.)  Fairfield moves for summary judgment on this claim arguing that it satisfied the requirement to engage in an interactive process when Martin, an assistant superintendent, met with Conley to discuss the extent of his blindness and how he manages a classroom.  Lakota, on the other hand, moves for summary judgment on the basis that Conley failed to identify any reasonable accommodation which would enable him to perform the essential functions of the substitute teacher position.  The failure to engage in the interactive process is not actionable if the disabled person is not qualified for the position even with a reasonable accommodation.  *Ford Motor Co.*, 782 F.3d at 766.

23

Conley does not address the failure to accommodate claims in his Memoranda in Opposition to the Motions for Summary Judgment. "[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013). Moreover, Conley has not identified nor provided evidence regarding a reasonable accommodation which he requested from Fairfield or Lakota and was denied. The Court will **GRANT** summary judgment to Fairfield and Lakota on the failure to accommodate claims.

IV.     **CONCLUSION**

For the foregoing reasons, Lakota's Motion in Limine to Exclude Testimony of Virginia L. Rhodes (Doc. 54) and Objections and Motion to Strike Inadmissible Evidence (Doc. 55) are **DENIED**. Lakota's Motion for Summary Judgment (Doc. 43) and Fairfield's Motion for Summary Judgment (Doc. 45) are **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is granted to Lakota and Fairfield on the failure to accommodate claims, but is denied on the disability discrimination claims.

**IT IS SO ORDERED.**

Dated this 15th day of October, 2018.


BY THE COURT:


s/Susan J. Dlot

Susan J. Dlott
United States District Judge